IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JESSICA LESKO, | CASE NO. 1:23-cv-1849 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **MEMORANDUM OPINION AND ORDER** |

Plaintiff Jessica Lesko filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 6. Following review, and for the reasons stated below, I vacate and remand the Commissioner's decision.

**Procedural history**

In September 2021, Lesko filed an application for disability insurance benefits alleging a disability onset date of March 6, 2020,[1] and claiming she was disabled due to Achilles tendonitis and a left rotator cuff tear. Tr. 357–58, 409. The Social Security Administration denied Lesko's application and her

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

motion for reconsideration. Tr. 228, 235. Lesko then requested a hearing before an Administrative Law Judge (ALJ). Tr. 313.

In June 2022, an ALJ held a hearing. Lesko and a vocational expert testified. Tr. 181–209. The next month, the ALJ issued a written decision finding that Lesko was not disabled. Tr. 162–75. The ALJ's decision became final on August 4, 2023, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Lesko filed this action on September 23, 2023. Doc. 1. She asserts the following assignment of error:

> Whether the Administrative Law Judge erred in determining that Ms. Lesko retained a sedentary residual functional capacity without the additional restrictions of needing to ice and elevate her leg and occasionally reach in all directions with her left upper extremity.

Doc. 7, at 1.

**Evidence**

*Personal and vocational evidence*

Lesko was born in 1976 and was 44 years old on her alleged disability onset date. Tr. 173, 358. She completed two years of college and used to work as a food service manager. Tr. 22, 196.

*Relevant medical evidence*

Before her March 2020 alleged disability onset date, Lesko was spending 14 hours a day on her feet working as a restaurant manager. Tr. 584. In late January she experienced a bump on the back of her left ankle and pain. Tr.

656. In February she saw an orthopedic doctor, whose impression was Achilles tendonitis. Tr. 649–50. The doctor prescribed an air cast, heel-lift orthotics, and physical therapy. Tr. 650.

In early March 2020, Lesko called the doctor to say that because she continued to work, she had been unable to stay off her feet as her physical therapist had recommended. Tr. 643. She attended physical therapy and took Aleve twice a day. Tr. 643. On March 6, 2020, Lesko went on short-term disability. Tr. 642.

In late March, Lesko had a virtual follow-up visit with her orthopedic doctor. Tr. 635. Lesko reported no relief from using the boot, orthotics, or Aleve and Ibuprofen. The doctor observed that Lesko's left Achilles tendon was swollen. Tr. 637. The doctor prescribed Meloxicam and Voltaren gel and wrote a letter stating that Lesko should remain off work until early May. Tr. 637, 791.

In early July 2020, Lesko underwent a "TenJet percutaneous tendon debridement."[2] Tr. 624. She remained off work. *See, e.g.*, Tr. 888.

In late October 2020, Lesko saw orthopedic surgeon Alan Davis, M.D., for a surgical consultation. Tr. 588. Lesko reported that the July procedure had not provided relief. Tr. 588. Dr. Davis's exam findings indicated that Lesko had

---

[2]    A TenJet procedure uses an ultrasound-guided, high-pressure saline stream to break up and remove scar tissue. https://www.mayoclinic.org/departments-centers/biotherapeutics-advanced-procedures-clinic/overview/ovc-20546210 [https://perma.cc/2NAL-YFQJ].

a "bulbous area … above the insertion site of the [A]chilles," Achilles tenderness and tightness, no swelling or redness, and a positive Achilles provocation sign. Tr. 590. She had a normal gait with no limp, a normal range of motion in her left ankle, and intact tendon stability. Tr. 590. Dr. Davis recommended surgery. Tr. 591–92. Lesko agreed, and a week later Dr. Davis reported to Lesko's insurance company that Lesko was to have surgery on November 10. Tr. 924–25. She would be off work until late February 2021 while she recovered. Tr. 925.

On November 10, 2020, Dr. Davis performed a left Achilles tendon debridement and repair. Tr. 568.

A month later, Lesko required emergency anticoagulation treatment due to a blood clot in her left leg. Tr. 560.

On December 21, Lesko started post-surgical physical therapy. Tr. 549–50. Her initial evaluation indicated that she had decreased range of motion and strength, postural abnormalities, and decreased functional mobility of her left leg. Tr. 550. Two days later, Lesko slipped and hurt her ankle. Tr. 549. Five days after that, Lesko reported that she felt much better. Tr. 549. She was "[i]cing [all day] and taking it easy." Tr. 549.

On January 25, 2021, Lesko had her fourth physical therapy visit. Tr. 536. She was progressing more slowly than expected. Tr. 537. She was able to walk short distances with a straight cane. Tr. 539.

On January 26, Lesko saw Physician's Assistant Alexandria Milan at the orthopedic department for left shoulder pain. Tr. 535. Lesko reported that eight weeks before the visit, she injured her shoulder when her crutch slipped and she fell into a wall. Tr. 533. Left shoulder x-rays showed no abnormalities. Tr. 533. Milan assessed Lesko with adhesive capsulitis (a frozen shoulder) and acute left shoulder pain, administered a cortisone injection, and referred Lesko to physical therapy. Tr. 536. On February 23, Lesko told Milan that the injection helped with pain, but physical therapy had not significantly increased her range of motion. Tr. 514. Milan referred Lesko to Dr. King for a possible brisement procedure.[3] Tr. 515.

On March 11, 2021, Lesko saw a primary care doctor for deep vein thrombosis. Tr. 502. Lesko reported that she had a history of deep vein thrombosis, which she had "provoked" after her recent surgery, and said that she was taking medication for it. Tr. 502. She felt "heaviness, edema and pain." Tr. 502. She also complained of some itching, numbness, and tingling in her left foot near her fifth metatarsal (the long bone on the outside of the foot). Tr. 502. Exam findings showed that Lesko had a normal range of motion, edema, and tenderness to palpation in her left calf. Tr. 503. She had a normal gait. Tr. 503. The doctor assessed Lesko with post-thrombotic syndrome of her left leg

---

[3]     "Brisement … involves injecting a large volume of fluid into the joint to stretch out the capsule" and is used to treat a frozen shoulder. *See* https://consultqd.clevelandclinic.org/combination-therapy-speeds-relief-of-frozen-shoulder [https://perma.cc/G3TF-YBSL].

and chronic deep vein thrombosis of the left peroneal vein. Tr. 504. The doctor recommended leg exercises, leg elevation, and daily use of compression stockings. Tr. 504.

On March 22, 2021, Lesko saw Dr. Davis for a post-surgical Achilles follow-up. Tr. 496. Lesko reported that she walked with a cane and felt that her swelling had increased. Tr. 496. Overall, she rated her weight-bearing status as "partial" and her her condition as "better." Tr. 496–97. Dr. Davis's exam findings showed that Lesko had mild swelling, a good range of motion, and peroneal tendon weakness. Tr. 497. Dr. Davis also noted that a foot x-ray taken earlier that month showed bone spurs. Tr. 497. He recommended that Lesko "work on band resistance strengthening" and return in one month. Tr. 497.

On March 24, 2021, Lesko saw surgeon Dominic King, D.O., for a shoulder surgery consultation. Tr. 490. Dr. King was unable to perform a full exam of Lesko's left shoulder due to Lesko's limited range of motion and reports of significant pain. Tr. 492. Dr. King diagnosed adhesive capsulitis of the left shoulder and administered an injection to Lesko's left glenohumeral joint. Tr. 492.

In mid-April 2021, Lesko followed up with Dr. Davis. Tr. 478. Lesko reported that she "has continued with [physical therapy], the bands, towels and the exercise bike." Tr. 478. She reported that she had been more active and experienced intermittent pain in the back of her ankle. Tr. 478. She had

"some swelling in that area" and "will elevate and ice which helps." Tr. 478. Lesko's weight-bearing status was "partial" and she used a cane. Tr. 478. She wasn't taking any pain medication or non-steroidal anti-inflammatory drugs. Tr. 478. On exam, Lesko had a good range of motion, Achilles thickness, and moderate swelling and tenderness. Tr. 478. Dr. Davis instructed Lesko to apply ice for 20 minutes, three to four times a day; wear an "air heel," a compression ankle brace with a heel lift; and discontinue strengthening exercises. Tr. 478.

Also in mid-April, Lesko told Milan that her left shoulder range of motion was improving but that her pain was not. Tr. 1060. Milan ordered an MRI, Tr. 1060, which Lesko underwent in early May 2021, Tr. 463. The MRI showed "a low[-]grade partial articular surface tear[] involving the anterior aspect of the supraspinatus tendon," "mild arthritic expansion of the acromioclavicular joint," and "mild subacromial subdeltoid bursitis." Tr. 465. Milan assessed chronic left shoulder pain, adhesive capsulitis, and acromioclavicular joint arthropathy. Tr. 466. She administered a subacromial bursa injection. Tr. 466.

On May 11, 2021, Dr. Davis completed a form for Lesko's insurance company regarding Lesko's Achilles tendinosis. Tr. 1358. He referenced her November 2020 surgery and stated that Lesko had occasional tenderness; decreased tolerance for standing, walking, and lifting; and that she needed to work on strengthening. Tr. 1358. He wrote that Lesko couldn't return to her past job, which required her to stand and walk for an entire eight-hour shift

7

and lift and carry over 20 pounds, but that she could return to work with restrictions on May 24. Tr. 1358.

On May 17, 2021, Lesko followed up with Dr. Davis. Tr. 461. She reported that her ankle brace helped. Tr. 461. She walked less, used a cane, and had been icing her ankle two to three times a day. Tr. 461. Her pain was constant and she rated it a six out of ten. Tr. 461. Dr. Davis's exam showed that Lesko had decreased swelling and decreased tenderness. Tr. 461. He assessed Lesko with "overall good progression with healing." Tr. 462. He recommended that Lesko resume Achilles strengthening; continued to wear her brace; ice, elevate, and rest; and avoid stretching. Tr. 462.

The next day Dr. Davis completed a form for Lesko's insurance company and opined that Lesko couldn't stand, walk, or lift "all day," but she could perform "seated work with light walking/standing." Tr. 1359. He explained that Lesko could constantly sit, stand for 15 minutes per hour, occasionally reach overhead, frequently reach to desk-height and below the waist, and frequently lift and carry 20 pounds. Tr. 1359–60.

On June 23, 2021, Lesko returned to Dr. Davis for a follow-up. Tr. 459. She said that her condition was about the same. Tr. 459. Her ankle brace was causing increased pain. Tr. 459. She had consistent swelling. Tr. 459. She iced her ankle three times a day and elevated her leg as needed. Tr. 459. Dr. Davis noted that Lesko's status was full weight-bearing and that she did not use an assistive device. Tr. 459. He ordered an MRI due to Lesko's "minimal

8

progression of healing." Tr. 460. The MRI showed "severe fusiform thickening of the distal Achilles tendon" and a "[s]mall foci of intrasubstance partial-thickness tearing" consistent with Achilles tendinosis. Tr. 457–58. Dr. Davis discussed with Lesko non-surgical and surgical treatments, including an Achilles tendon debridement and reconstruction by repositioning the flexor hallucis longus tendon (the long tendon connecting the calf muscle to the big toe). Tr. 458.

In August 2021, Dr. Davis completed a form for Lesko's insurance company and opined that Lesko could not perform sustained walking, standing, or heavy lifting. Tr. 1813. She could perform sedentary work with the ability to elevate her foot as needed. Tr. 1813. He noted that another surgery had been offered but not scheduled. Tr. 1813.

Lesko continued to attend physical therapy for her left shoulder. In mid-November 2021, she exhibited in her left shoulder a decreased range of motion, strength, and functional mobility and postural abnormalities—all due to decreased motor control and joint dysfunction. Tr. 759. Physical exam findings showed reduced left shoulder flexion, abduction, and rotation. Tr. 760.

In early 2022, Lesko developed left hip pain. Tr. 1891. An x-ray in March showed no acute osseous abnormality, but an abnormality "overlying the left supra-acetabular ilium which may represent a bone island." Tr. 1875. Exam findings showed that Lesko had left hip pain and reduced range of motion. Tr. 1894. She attended physical therapy. Tr. 1961. She walked without an

assistive device and had an abnormal gait—decreased stride length and "decreased push off left foot." Tr. 1963. She couldn't perform a "[left] single leg heel raise." Tr. 1963. Lesko reported that she "ha[d] been propping her left heel on toes of her right foot." Tr. 1961. The treatment note states that Lesko couldn't work "due to Achilles and left shoulder." Tr. 1962.

In April 2022, Lesko had a virtual visit with a doctor in a sports health center for severe left hip pain. Tr. 2039. A recent left hip MRI showed that Lesko had an anterosuperior acetabular labral tear, mild chondral changes, and significant trochanteric bursitis. Tr. 2039–40. The doctor recommended a left hip joint injection and physical therapy. Tr. 2040.

Also in April, Lesko had a cervical spine x-ray, which showed spondylosis and reversal of the normal cervical spine lordosis "related to patient positioning or muscle spasm." Tr. 2074. Dr. King diagnosed Lesko with cervical radiculitis and impingement syndrome of the left shoulder and administered a left glenohumeral joint injection. Tr. 2079.

*State agency opinions*[4]

In October 2021, Hemantha Surath, M.D., reviewed Lesko's record and assessed Lesko's residual functional capacity (RFC).[5] Tr. 231–33. Dr. Surath opined that Lesko could stand and walk for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, occasionally lift and carry 20 pounds, and frequently lift and carry 10 pounds. Tr. 231. She had various postural limitations and could only frequently lift in all directions with her left arm. Tr. 231–32. She needed to avoid walking on uneven surfaces. Tr. 232.

In January 2022, Elizabeth Das, M.D., reviewed Lesko's record and agreed with Dr. Surath's opinion, except that Dr. Das added more postural limitations. Tr. 239–40.

*Hearing testimony*

Lesko, who was represented by counsel, testified at the telephonic administrative hearing held in June 2022. When asked what medications she

---

[4]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

was taking, Lesko said that she took Mobic and anti-inflammatories. Tr. 188. The week before the hearing her doctor prescribed an ointment to apply to her Achilles heel, to desensitize it. Tr. 188.

Lesko said that she experienced severe pain, which caused migraines. Tr. 188. She estimated that she had two migraines a week. Tr. 189. Getting her pain under control helped resolve her migraines, and she used heat or ice to manage her pain. Tr. 189.

Lesko stated that she had problems on her left side. Tr. 189. She has left hip bursitis and received a steroid injection about a week before the hearing. Tr. 189–90. The injection hadn't helped and Lesko was icing her hip. Tr. 190. She receives left shoulder injections every six months, which provide some relief that lasts about a month. Tr. 189–90. She had difficulty turning the steering wheel while driving her car. Tr. 190–91. Medications hadn't helped her hip or shoulder. Tr. 191.

Lesko has attended physical therapy for her shoulder for about two years. Tr. 191. The therapy helped to the extent that her shoulder had been a lot worse—it was frozen—and now she can move it. Tr. 191. She still has a hard time lifting an item out of the refrigerator. Tr. 191. She can't "put something on a shelf" or "braid [her] hair … have my arm up like that." Tr. 191. When asked if she used ice or heat to treat her hip or shoulder, Lesko said that "ice packs" and "heated seats in my car are my best friends." Tr. 192. She performs home physical therapy exercises and avoids doing things that

aggravate her pain. Tr. 192.

When asked about her Achilles tendon history, Lesko stated that she had three surgeries—"[t]wo minimally invasive and then one reconstruction." Tr. 192. The reconstruction surgery "didn't hold," so the doctor wanted to do a tendon transfer and "take the tendon from [her] big toe and try to graft it in." Tr. 192. There is no guarantee that this will work, but it's the final procedure that doctors could try. Tr. 193. Lesko rated her daily Achilles-tendon pain as an eight out of ten. Tr. 193. She has a hard time walking and functioning. Tr. 193. She can walk for about 15 minutes. Tr. 193. She can stand for about 15 minutes and then she "want[s] to put [her] foot up like a flamingo." Tr. 193. "It feels like it's going to snap." Tr. 193. She doesn't wear a brace "because of the swelling." Tr. 193. Lesko explained that her tendon is swollen every day and the brace pushes against it. Tr. 193. She "has a hard time even just sitting … with [her] foot up because … just sitting on the couch or on a chair hurts touching it[.]" Tr. 193–94. She had previously used a cane, stopped using it, and then began using it again because she felt that walking without the cane caused her to compensate in a way that made her hip worse. Tr. 194. When asked whether her then-recently prescribed Achilles ointment was helping, Lesko said that she hadn't noticed a difference. Tr. 194. The ointment made the outside of her tendon feel numb but she still felt pain underneath. Tr. 194.

When asked if she had any problems sitting, Lesko answered that she constantly rotates herself when she sits and changes position. Tr. 194–95. Her

left hip has made sitting painful. Tr. 195. She has problems sleeping at night due to pain and uses ice packs and "move[s] around a little bit." Tr. 195. When asked to describe a typical day, Lesko said that she attends physical therapy twice a week and performs her home exercises. Tr. 196. She showers, feeds her pets, and lets the dogs out. Tr. 196. She can't do certain chores such as carrying laundry and mopping floors, Tr. 196, but she can fold laundry and do basic cooking. Tr. 197.

The ALJ discussed with the vocational expert Lesko's past work as a food service manager. Tr. 203. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age and education as Lesko could perform work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 203–04. The vocational expert answered that such an individual could perform the following jobs: surveillance monitor, document preparer, and telephone quotation clerk. Tr. 204–05. The ALJ asked if the hypothetical individual could perform work if the individual would be off-task for 33 percent of the day due to a "need to frequently change positions to alleviate pain" and "the potential need to elevate the legs." Tr. 206. The vocational expert said that there would be no work for such an individual to perform, explaining that a worker who was off-task more than nine percent of a workday would not be employable. Tr. 206.

14

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2026.

2.  The claimant has not engaged in substantial gainful activity since March 6, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

3.  The claimant had the following severe impairments: left hip bursitis, left shoulder impingement with adhesive capsulitis, left Achilles tendonitis status post surgery, and obesity (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except She could occasionally use foot controls bilaterally. She could never climb ladders, ropes or scaffolds but could occasionally climb ramps and stairs. She could frequently stoop and crouch. The claimant could occasionally kneel and crawl. She could occasionally reach overhead with the left upper extremity. The claimant could frequently reach in other directions with the left upper extremity. She must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. There should be no commercial driving.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born [i]n … 1976 and was 44

years old, which is defined as a younger individual age 18–44, on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45–49 (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, since March 6, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. 164–75.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

16

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which"

the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Lesko argues that the ALJ erred when he failed to include in the RFC a limitation that Lesko would need to ice and elevate her leg "on a daily or as needed basis." Doc. 7, at 10. She contends that the ALJ ignored Dr. Davis's and Lesko's statements that Lesko would need to elevate her leg. *Id*. at 12.

The Commissioner asserts that "Dr. Davis only once during the ordinary course of treatment recommended [Lesko] elevate her leg … [and] did so in April 2021." Doc. 9, at 8 (citing Tr. 478). On that day, five months after her Achilles-tendon-repair surgery, Lesko reported intermittent Achilles pain and "some swelling." Tr. 478. Dr. Davis wrote, "[Lesko] will elevate and ice which helps." Tr. 478. He also recommended that Lesko wear a brace with a heel-lift, discontinue strengthening exercise, and modify her activities. Tr. 478–79.

But a month later Dr. Davis again told Lesko to ice and elevate her leg. Tr. 461. On May 17, 2021, Lesko reported that she had been wearing her brace and limiting her walking as instructed. Tr. 461. She was icing her Achilles tendon two to three times a day and was about to re-start physical therapy. Tr. 461. Dr. Davis commented that Lesko was "showing overall good progression of healing with decreased swelling and tenderness." Tr. 462. "Therefore," Dr. Davis wrote, "she will begin … [A]chilles strengthening. She will also continue

19

to wear the air heel, icing, elevating, and resting. She will avoid stretching at this point." Tr. 462. So the Commissioner's assertion that Dr. Davis "only once" recommended that Lesko elevate her leg is not accurate.

At Lesko's next appointment on June 23, 2021, Lesko told Dr. Davis that her condition was about the same but her ankle brace was causing increased pain, which she described as "sharp." Tr. 459. She reported consistent swelling, iced her ankle three times a day, and elevated her leg as needed. Tr. 459. Dr. Davis assessed Lesko with "minimal progression" and ordered an MRI, which showed that Lesko's Achilles tendon had worsened.[6] Tr. 456–57; *see also* Tr. 591. Dr. Davis discussed with Lesko another possible surgery—a debridement and tendon transfer. Tr. 458. And in August 2021, Dr. Davis opined that Lesko could perform sedentary work "with [the] ability to elevate foot as needed." Tr. 1813. In other words, the record shows that after Lesko's November 2020 tendon-repair surgery, Dr. Davis twice recommended that Lesko ice and elevate her left foot; Lesko's condition briefly improved with rest and activity modification; did not improve thereafter; and, as a result, Dr. Davis

---

[6]     The interpreting physician's impression of Lesko's June 2021 MRI was "[s]ignificant tendinosis of the distal Achilles tendon, with advanced fusiform thickening and small foci of partial-thickness tearing of the intrasubstance fibers." Tr. 456. Lesko's April 2020 MRI showed "[n]ormal in signal demonstrating short segment fusiform thickening of the distal tendon measuring up to 1 cm in greatest AP dimension," Tr. 591, which the interpreting physician described as "mild-moderate Achilles tendinosis," Tr. 715.

recommended another surgery and opined that Lesko could perform sedentary work if she could elevate her foot as needed.

The ALJ considered in one passage all of the opinions offered by four of Lesko's providers, including Dr. Davis's August 2021 opinion about Lesko's need to elevate her foot.[7] Tr. 172–73. The ALJ described Dr. Davis's opinions as follows:

> In October 2020, Alan Davis, MD suggested no standing, walking, climbing, lifting carrying or crawling during a surgical recovery after a planned November 2020 Achilles procedure. (3F/140–142) In November 2020, Dr. Davis indicated the claimant could not return to work, and indicated no ability to perform any physical task in a check box form. (3F/205–208) Later, Dr Davis specified that she "cannot be all over a restaurant right now." (3F/209) …. In May 2021, Dr. Davis opined she should not be standing/walking for whole 8 hour shifts and no lifting over 20 pounds. There should be no climbing, crawling or crouching. (3F/575–577) In August 2021, Dr. Davis suggested no prolonged standing/walking and no heavy lifting. She can perform sedentary work with elevation of the foot as needed. She was noted to be activ[el]y searching for and applying to jobs. (3F/1030).

Tr. 172–73. The ALJ evaluated these and at least five other opinions from three other sources as follows:

> These opinions are not persuasive nor supportable. They are mostly vague in nature, failing to offer a maximum residual functional capacity or any specific restrictions or findings except for a few with

---

[7]      Under 20 C.F.R. § 416.920c(b)(1), an ALJ may consider "multiple medical opinion[s]" from "one medial source" "together in a single analysis." Here, the ALJ considered multiple medical opinions from multiple sources together in a single analysis.

> check boxes or one sentence. The proposed limits
> vary widely, and each were for a short period of time
> less than 12 months. They all address the claimant's
> work in a restaurant, which required apparent full-
> time standing/walking. They do not address other
> jobs that the claimant may or may not be able to
> perform. Further, the issue of disability is reserved
> to the Commissioner.

Tr. 173.

There are a number of problems with the ALJ's explanation. Dr. Davis's opinion that Lesko can perform sedentary work if she can elevate her legs as needed was not, like some of the other opinions dealing with Lesko's short-term disability status, "for a short period of time less than 12 months."[8] *See* Tr. 1813. Unlike others, the opinion did not "address the claimant's work in a restaurant." *See id*. The opinion addressed other jobs that Lesko could perform, and it didn't wade into an issue reserved to the Commissioner. *Id*.

That leaves the ALJ's explanation that the opinion is "mostly vague in nature" and failed to "offer a maximum residual functional capacity or any specific restrictions or findings except for a few with check boxes or one sentence." Dr. Davis's August 2021 opinion wasn't a check-box form and it contained more than one sentence. Tr. 1813. It offered a residual functional capacity—sedentary work—with a specific restriction—the ability to elevate a foot as needed. *Id*. This restriction isn't "vague in nature"; indeed, the ALJ

---

[8] Dr. Davis wrote that Lesko could at that time perform work with restrictions, but that it was "not foreseeable" she could perform work without restrictions minus another surgery. Tr. 1813.

himself used the phrase "potential … need to elevate the legs" when questioning the vocational expert. Tr. 206.

I am mindful that the regulations don't require an ALJ to evaluate each finding within an opinion. *See* 20 C.F.R. § 404.1520c(b)(1); *see, e.g., Riney v. Comm'r of Soc. Sec.*, No. 5:23-CV-1776, 2024 WL 898561, at *13 (N.D. Ohio Feb. 15, 2024), *report and recommendation adopted*, 2024 WL 895157 (N.D. Ohio Mar. 1, 2024). But here, the ALJ highlighted Dr. Davis's opinion that Lesko could perform sedentary work if she could elevate her legs as needed, Tr. 173, and none of the ALJ's reasons for discounting this opinion are valid. The ALJ acknowledged Lesko's statement to Dr. Davis that icing and elevating her foot helped, Tr. 170, but didn't acknowledge Dr. Davis's twice-recommended advice to Lesko that she ice and elevate her legs, Tr. 462, 472. The ALJ recited Lesko's chronological treatment history for her Achilles tendon and ended with Lesko's June 2021 MRI showing that Lesko's condition had worsened and Dr. Davis's recommendation for another surgery.[9] Tr. 169–70. But the ALJ didn't provide any analysis or conclusion about this evidence. Tr. 170. And as discussed below, the balance of the ALJ's decision lacks sufficient reasoning to explain the ALJ's rejection of a leg-elevation limitation.

---

[9]     The ALJ wrote that Lesko "agreed to" this procedure, Tr. 170, but the treatment notes the ALJ cited only show that the doctor discussed it, Tr. 456–61. Lesko testified that there is no guarantee another reconstruction surgery will work. Tr. 192–93.

For instance, the Commissioner argues that neither of the stage agency reviewers opined that Lesko needed to ice or elevate her leg. Doc. 9, at 8–9 (citing Tr. 232, 239). This argument might carry more weight if the ALJ had relied on the state agency reviewers' opinions. But the ALJ found the reviewers' opinions—that Lesko could stand and walk six hours in an eight-hour workday—"only partially persuasive" and instead limited Lesko to sedentary work. Tr. 172. Nothing in the ALJ's evaluation of the state agency reviewers' opinions offers clues as to why the ALJ rejected Dr. Davis's opinion that Lesko needed to elevate her leg. The ALJ explained that Lesko didn't require further limitations due to her "good response to surgeries, physical therapy and injections." Tr. 172. But Lesko's Achilles-tendon surgeries were not successful. *See, e.g.,* Tr. 233 (state agency reviewer describing Lesko's "failure of initial surgical management with re-do surgery"). The ALJ also wrote that, as to all of Lesko's impairments, she was not in pain management, only used anti-inflammatory medications with an occasional steroid or muscle relaxer, and didn't use "any narcotic medications for pain." Tr. 172. To the extent that this comment relates to Lesko's Achilles tendinosis, the ALJ didn't discuss whether Dr. Davis recommended these treatment modalities to Lesko. What Dr. Davis did recommend was that Lesko ice and elevate her leg—but the ALJ ignored this treatment recommendation and Lesko's reports that icing and elevation were effective. *See, e.g.,* Tr. 478.

Finally, the ALJ twice said that Lesko was diagnosed with "Achilles tendonitis," Tr. 165, 168, but Lesko has "Achilles tendinosis," Tr. 458, 1358, which is different. Tendinitis is acute tendon inflammation caused by overuse or injury, whereas tendinosis is "a chronically damaged tendon with disorganized fibers and a hard, thickened, scarred and rubbery appearance" caused by degeneration. *See* Cleveland Clinic, Tendinitis or Tendinosis? https://health.clevelandclinic.org/tendinitis-tendinosis-difference-important-treatments-help [https://perma.cc/V9NS-WEE3]. And the conditions are treated differently. *See id*. It's not clear whether the ALJ appreciated this distinction.

All told, the ALJ's rejection of a leg-elevation restriction lacks substantial evidence, which is grounds for remand for further evaluation. *See Jordan*, 548 F.3d at 422. Because remand is required for this reason, I don't consider Lesko's other argument that the ALJ erred when he found that Lesko could frequently, rather than occasionally, reach in various directions with her left arm. *See* Doc. 7, at 14. On remand, the ALJ will have an opportunity to re-evaluate Lesko's reaching abilities.

**Conclusion**

For the reasons explained above, the Commissioner's decision is vacated and remanded for proceedings consistent with this opinion.

Dated: April 1, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge
